5:13 CV 00578

UNITED STATES DIESTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| EDWARD DONAHUE, Derivatively on Behalf of BIGLARI HOLDINGS INC., | ) Case No. |
| | ) |
| | ) VERIFIED SHAREHOLDER DERIVATIVE |
| Plaintiff, | ) COMPLAINT FOR BREACH OF FIDUCIARY |
| | ) DUTY, WASTE OF CORPORATE ASSETS |
| v. | ) AND UNJUST ENRICHMENT |
| | ) |
| SARDAR BIGLARI, PHILIP L. COOLEY, RUTH J. PERSON, KENNETH R. COOPER, WILLIAM L. JOHNSON, and JAMES P. MASTRIAN, | ) |
| | ) |
| | ) |
| | ) |
| Defendants, | ) |
| | ) |
| -and- | ) |
| | ) |
| BIGLARI HOLDINGS INC., an Indiana corporation, | ) |
| | ) |
| | ) |
| Nominal Defendant. | ) |
| | ) DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE ....................................................................................3

III.    THE PARTIES............................................................................................................3

    A.    Plaintiff...........................................................................................................3

    B.    Nominal Defendant ........................................................................................4

    C.    Defendants......................................................................................................4

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS ..........................................................8

    A.    Fiduciary Duties .............................................................................................8

    B.    Breaches of Duties .........................................................................................8

    C.    Additional Duties of the Audit Committee Defendants ..............................9

    D.    Additional Duties of the Governance, Compensation and Nominating
       Committee Defendants....................................................................................9

V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ..............10

VI.     BACKGROUND OF DEFENDANT BIGLARI'S CONTROL OF BHI ........................11

    A.    Defendant Biglari Gains Control of Western Sizzlin..............................11

    B.    Defendant Biglari Gains Control of Steak n Shake.................................12

    C.    Defendant Biglari Causes BHI to Violate Federal Law..........................13

VII.    DEFENDANT BIGLARI'S HISTORY OF SELF-DEALING AT BHI .........................14

    A.    Defendant Biglari Cements His Control over Steak n Shake by Initiating a
       Reverse Stock Split .......................................................................................14

    B.    Steak n Shake Renamed Biglari Holdings Inc. .......................................15

    C.    Acquisition of Biglari Capital, Investment into the Lion Fund, and
       Defendant Biglari's Resulting Excessive Compensation Plan .................15

VIII.   DEFENDANT BIGLARI'S CHALLENGED SELF-DEALING ...................................19

|  |  |  |
|---|---|---|
| | A. | Defendant Biglari's Self-Serving License Agreement ...........................................19 |
| | B. | Defendant Biglari Continues to Increase His Power over BHI with a New Rights Offering.....................................................................................................21 |
| IX. | | DAMAGES TO BHI.........................................................................................................22 |
| X. | | DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .......................................22 |
| | A. | Demand Is Excused Because Defendants Have the Burden of Proving the Entire Fairness of the License Agreement at Issue in This Action .........................23 |
| | B. | Demand Is Excused Because a Majority of the Board Lacks Independence From, and Is Beholden to, Defendant Biglari .........................................................24 |
| | C. | Demand Is Excused Because Defendants Cooper, Johnson, Mastrian, and Person Face a Substantial Likelihood of Liability for Their Misconduct ...............26 |
| XI. | | COUNT I - AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH FIDUCIARY DUTY......................................................................................29 |
| XII. | | COUNT II - AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS ............................................................................30 |
| XIII. | | COUNT III - AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT .....................................................................................31 |
| XIV. | | PRAYER FOR RELIEF ...................................................................................................31 |
| XV. | | JURY DEMAND ..............................................................................................................33 |

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Biglari Holdings Inc. ("BHI" or the "Company") against certain of its officers and directors for breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

2.     Plaintiff brings this action to address self-dealing by BHI's Chief Executive Officer ("CEO") and Chairman, defendant Sardar Biglari ("Biglari").   In particular, plaintiff challenges the self-serving Trademark License Agreement ("License Agreement") defendant Biglari entered into with the Company.  The License Agreement allows BHI the right to use the name "Biglari" for twenty years without paying royalties unless defendant Biglari's employment is terminated without cause, there is a change in control at the Company, or an "[i]nvoluntary [t]ermination [e]vent" arises.  If one of these triggering events occurs, however, BHI is penalized by having to pay defendant Biglari *2.5%* of the Company's revenue for at least *five years*.

3.     The License Agreement is nothing more than a thinly hidden way for defendant Biglari to further entrench himself into his position of power atop BHI.  The License Agreement does not provide any benefit to the Company because there was no apparent business purpose in naming the Company after defendant Biglari in the first place, other than to aggrandize defendant Biglari.  BHI's two main assets are its wholly-owned subsidiary restaurant chains, Western Sizzlin Corporation ("Western Sizzlin") and Steak n Shake Operations, Inc. ("Steak n Shake").  These chains account for over *99%* of the Company's revenue and have no connection to defendant Biglari's name or likeness.  As such, the Company gains nothing by entering into the License Agreement and being allowed to use the name "Biglari."

4.     The License Agreement provides defendant Biglari, on the other hand, near absolute job security for twenty years.  BHI simply cannot afford to pay defendant Biglari 2.5% of its revenue as the magnitude of such a payment would threaten the Company's liquidity and

would wipe out nearly all of its net income available to shareholders.  For example, based upon the Company's 2012 reported revenue, defendant Biglari would be entitled to as much as *$18.35 million* under the License Agreement, while the net income available to common shareholders was only *$21 million*.

5.     Because defendant Biglari stands on both sides of the License Agreement, the BHI Board of Directors (the "Board") had a fiduciary obligation to ensure that this transaction was entirely fair to the Company.  As discussed in more detail below, the Individual Defendants (as defined herein) have failed in their duties.  The License Agreement benefits one person, defendant Biglari, at the expense of the Company.

6.     The Board's decision to acquiesce to defendant Biglari's self-dealing is unsurprising given its history of consenting to transactions that are beneficial to defendant Biglari but detrimental to BHI.  These previous self-dealing transactions included: (i) initiating a twenty for one reverse stock split to make it more difficult for small shareholders to challenge defendant Biglari's management of the Company; (ii) changing the Company's name from Steak n Shake to "Biglari Holdings Inc.," after defendant Biglari; (iii) causing the Company to advance tens of millions of dollars into The Lion Fund, L.P. ("Lion Fund"), an investment fund controlled by defendant Biglari, in which half the members of the Board invest; and (iv) implementing an excessive compensation plan and a golden parachute for defendant Biglari.

7.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company, rescission of the self-serving License Agreement, and the implementation of greater controls to prevent future one-sided self-dealing.  The Individual Defendants will continue their systematic abuse of power without the Court's intervention.

## II.   JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.   This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

9.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. section 1391(a) because: (i) BHI maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to BHI, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.     Plaintiff

11.     Plaintiff Edward Donahue was a shareholder of BHI at the time of the wrongdoing challenged herein, has continuously been a shareholder since that time, and is a current BHI shareholder.  Plaintiff is a citizen of Massachusetts.

### B.   Nominal Defendant

12.   Nominal defendant BHI is a diversified holding company that engages in a number of diverse business activities.   In March 2010, the Company acquired 100% of the outstanding equity interests of Western Sizzlin.   The Company also acquired Biglari Capital Corp. ("Biglari Capital") in April 2010, pursuant to a Stock Purchase Agreement between the Company and defendant Biglari, the sole shareholder of Biglari Capital.   Prior to its name change in April 2010, BHI was known as "The Steak n Shake Company."   BHI's restaurant operations are conducted through two restaurant concepts, Steak n Shake and Western Sizzlin. Both Steak n Shake and Western Sizzlin engage in the franchising of restaurants.   BHI is an Indiana corporation with its principal executive offices located at 17802 IH 10 West, Suite 400, San Antonio, Texas.   Accordingly, BHI is a citizen of both Indiana and Texas.

### C.   Defendants

13.   Defendant Biglari is BHI's CEO and has been since August 2008, Chairman of the Board and has been since June 2008, and a director and has been since March 2008. Defendant Biglari is also Chairman and CEO of Biglari Capital and has been since 2000. Defendant Biglari was Western Sizzlin's CEO and President from May 2007 to March 2010, Chairman from March 2006 to March 2010, and a director from December 2005 to March 2010. Defendant Biglari was also Chairman of Western Sizzlin's Compensation Committee from at least April 2007 to at least June 2008 and a member of that committee from May 2006 to at least June 2008.   Defendant Biglari caused the Company to enter into the self-serving License Agreement.   BHI paid defendant Biglari the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|----------------------------------------|------------------------|-------|
| 2012 | $900,000 | $10,000,000 | $17,788 | $10,917,788 |
| 2011 | $900,000 | $3,992,391 | $30,264 | $4,922,655 |
| 2010 | $900,000 | $1,206,896 | $15,660 | $2,122,556 |
| 2009 | $467,231 | - | $48,214 | $515,445 |
| 2008 | $30,105 | - | $14,535 | $44,640 |

Defendant Biglari is a citizen of Texas.

14.     Defendant Philip L. Cooley ("Cooley") is BHI's Vice Chairman of the Board and has been since April 2009 and a director and has been since March 2008. Defendant Cooley is also an advisory director of Biglari Capital and has been since 2000. Defendant Cooley was Chairman of BHI's Audit Committee from at least March 2010 to September 2012 and a member of that committee from 2008 to September 2012. Defendant Cooley was also a member of BHI's Governance, Compensation and Nominating Committee from January 2010 to September 2010 and a member of BHI's Compensation Committee (prior to being merged with the Governance and Nominating Committee) in at least January 2009. In addition, defendant Cooley was Western Sizzlin's Vice Chairman from March 2006 to March 2010 and a director from December 2005 to March 2010. Moreover, defendant Cooley was Chairman of Western Sizzlin's Audit and Finance Committee from May 2005 to at least July 2009 and a member of Western Sizzlin's Compensation Committee from May 2006 to at least July 2009. Defendant Cooley knowingly or recklessly approved the License Agreement, which was beneficial to defendant Biglari at the expense of the Company. BHI paid defendant Cooley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2012 | $136,000 | - | $17,500 | $153,500 |
| 2011 | $113,408 | - | $30,000 | $143,408 |
| 2010 | $54,523 | - | - | $54,523 |
| 2009 | $40,420 | $5,559 | - | $45,979 |
| 2008 | $31,682 | $1,655 | - | $33,337 |

Defendant Cooley is a citizen of Texas.

15.    Defendant Ruth J. Person ("Person") is a BHI director and has been since 2002. Defendant Person is also a member of BHI's Audit Committee and has been since at least February 2010 and a member of BHI's Governance, Compensation and Nominating Committee and has been since at least January 2010.  Defendant Person knowingly or recklessly approved the License Agreement, which was beneficial to defendant Biglari at the expense of the Company.  BHI paid defendant Person the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Comp Plan Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2012 | $47,481 | - | - | - | - | $47,481 |
| 2011 | $45,280 | - | - | - | - | $45,280 |
| 2010 | $38,773 | - | - | - | - | $38,773 |
| 2009 | $41,647 | $5,559 | $14,910 | - | $590 | $62,706 |
| 2008 | $49,067 | - | $16,685 | - | $5,396 | $71,148 |
| 2007 | $51,083 | - | $18,327 | $66 | $5,259 | $74,735 |

Defendant Person is a citizen of Michigan.

16.    Defendant Kenneth R. Cooper ("Cooper") is a BHI director and has been since October 2010.  Defendant Cooper is also a member of BHI's Audit Committee and has been since October 2010 and was Chairman of that committee in at least February 2013.  Defendant Cooper is also a member of BHI's Governance, Compensation and Nominating Committee and has been since October 2010.  Defendant Cooper was a Western Sizzlin director from February 2007 to March 2010.  Defendant Cooper was also a member of Western Sizzlin's Audit Committee from February 2007 to at least July 2009.  Moreover, defendant Cooper was Chairman of Western Sizzlin's Compensation Committee from at least April 2009 to at least July 2009 and a member of that committee from February 2007 to at least July 2009.  Defendant Cooper knowingly or recklessly approved the License Agreement, which was beneficial to

defendant Biglari at the expense of the Company.  BHI paid defendant Cooper the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $13,000 | $13,000 |
| 2011 | $43,261 | $43,261 |

Defendant Cooper is a citizen of Texas.

17.  Defendant William L. Johnson ("Johnson") is a BHI director and has been since February 2012.  Defendant Johnson is also a member of BHI's Audit Committee and has been since February 2012 and a member of BHI's Governance, Compensation and Nominating Committee and has been since February 2012.  Defendant Johnson knowingly or recklessly approved the License Agreement, which was beneficial to defendant Biglari at the expense of the Company.  BHI paid defendant Johnson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $36,428 | $36,428 |

Defendant Johnson is a citizen of Michigan.

18.  Defendant James P. Mastrian ("Mastrian") is a BHI director and has been since August 2012.  Defendant Mastrian is also a member of BHI's Audit Committee and has been since August 2012 and a member of BHI's Governance, Compensation and Nominating Committee and has been since August 2012.  Defendant Mastrian knowingly or recklessly approved the License Agreement, which was beneficial to defendant Biglari at the expense of the Company.  BHI paid defendant Mastrian the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $7,427 | $7,427 |

Defendant Mastrian is a citizen of Texas.

19.     The defendants identified in ¶¶13-18 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶15-18 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶15-18 are referred to herein as the "Governance, Compensation and Nominating Committee Defendants."   Collectively, the defendants identified in ¶¶13-18 are referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

20.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe BHI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BHI in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of BHI and not in furtherance of their personal interest or benefit.

21.     To discharge their duties, the officers and directors of BHI were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of BHI were required to avoid engaging in, approving, or permitting self-dealing at the expense of the Company.

### B.     Breaches of Duties

22.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of BHI, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

23.     The Individual Defendants breached their duty of loyalty and good faith by engaging in, or allowing others to engage in, self-dealing at the expense of the Company.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of BHI, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

**C.      Additional Duties of the Audit Committee Defendants**

25.     In addition to these duties, under the Audit Committee Charter in effect since at least January 2010, the Audit Committee Defendants, defendants Cooper, Person, Mastrian, and Johnson, owed specific duties to BHI to assist the Board in overseeing the Company's operations.  Moreover, the Audit Committee's Charter provides that defendants Cooper, Person, Mastrian, and Johnson were required to ensure that the Company had an adequate system of internal controls to monitor and avoid self-dealing.

**D.      Additional Duties of the Governance, Compensation and Nominating Committee Defendants**

26.     Under the Governance, Compensation and Nominating Committee Charter in effect since at least May 2010, the Governance, Compensation and Nominating Committee Defendants, defendants Cooper, Person, Mastrian, and Johnson, owed specific duties to BHI to assist the Board in overseeing the Company's corporate governance guidelines and compensation policies.  The Governance, Compensation and Nominating Committee's Charter specially tasked defendants Cooper, Person, Mastrian, and Johnson with "[s]etting the compensation of the [CEO]."

## V.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

27.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

28.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) facilitate defendant Biglari's self-dealing; and (ii) enhance the Individual Defendants' executive and directorial positions at BHI, and the profits, power, and prestige that they enjoyed as a result of holding these positions.

29.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

30.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by acquiescing to defendant Biglari's self-dealing and consenting to transactions that were beneficial to defendant Biglari but detrimental to BHI. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

31.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.   BACKGROUND OF DEFENDANT BIGLARI'S CONTROL OF BHI

### A.   Defendant Biglari Gains Control of Western Sizzlin

32.    In 2000, defendant Biglari used the proceeds from the sale of an Internet company to launch the Lion Fund.  In 2005, defendant Biglari used the Lion Fund to purchase an 11% ownership position in Western Sizzlin, a steakhouse chain with more than 600 restaurants.

33.    Around the same time that he disclosed the Lion Fund's ownership stake in Western Sizzlin, defendant Biglari met with Western Sizzlin's executives and demanded that they give him and two of his loyal associates, defendant Cooley and non-defendant Paul D. Sonkin ("Sonkin"), seats on the Western Sizzlin board.  Defendant Biglari threatened that he would initiate a proxy battle if Western Sizzlin did not give up the board seats.  Western Sizzlin's officials caved and defendants Biglari, Cooley, and Sonkin joined the Board.  In March 2006, defendant Biglari initiated a complete coup of Western Sizzlin, forcing the resignation of the holdover directors, naming himself Chairman, and appointing defendant Cooley Vice Chairman.

34.    As Chairman of the Western Sizzlin board, defendant Biglari was given authority for all of Western Sizzlin's investment and major capital allocation decisions.  Defendant Biglari used this power to initiate a rights offering at Western Sizzlin.  Pursuant to the rights offering, for each share of common stock that Western Sizzlin owned, and for every two rights to buy more company stock that Western Sizzlin owned, Western Sizzlin shareholders were entitled to subscribe for one common share.  The subscription price was set at $7.00 per share.  The rights offering enabled defendant Biglari to acquire additional shares of Western Sizzlin in order to further solidify his control over the company.  By May 2006, defendant Biglari had acquired

control of 34% of Western Sizzlin's shares, more than three times the amount he held prior to initiating the rights offering.

**B.     Defendant Biglari Gains Control of Steak n Shake**

35.     After cementing his control of Western Sizzlin, defendant Biglari began acquiring shares of Steak n Shake, another restaurant chain.  By August 2007, defendant Biglari disclosed a nearly 6% position in Steak n Shake.  As Steak n Shake's third largest shareholder, defendant Biglari then initiated a proxy contest for two board seats of Steak n Shake.  As part of his proxy contest, defendant Biglari issued a letter to Steak n Shake's shareholders promising to put the interests of shareholders first if elected to the board.  As a result of these promises, on March 7, 2008, nearly three-fourths of Steak n Shake's shareholders voted to place defendants Biglari and Cooley on Steak n Shake's board.  Three months later, defendant Biglari was named Steak n Shake's Chairman.  Two months after that, defendant Biglari was named Steak n Shake's CEO. Just like Western Sizzlin, Steak n Shake gave defendant Biglari authority for all investment and major capital allocation decisions.

36.     Defendant Biglari's next move was to consolidate his ownership stakes in Western Sizzlin and Steak n Shake.  On August 13, 2009, Steak n Shake announced a deal to buy Western Sizzlin for $23 million, a mere 7% premium. The combination of the low premium and defendant Biglari's position in both companies caused people to question the adequacy of the merger.   For example, in an August 2009 analyst report, Michael W. Gallo of CL King & Associates criticized the merger for its apparent self-dealing.  Mr. Gallo's analyst report stated:

> *At first glance, there seems to us to be some self-dealing regarding the transaction*....   Given the apparent progress toward stabilizing [Steak n Shake] over the last couple of quarters, *this transaction makes no sense to us.*

37.     Despite the concerns regarding defendant Biglari's apparent self-dealing, Steak n Shake's acquisition of Western Sizzlin closed on March 30, 2010.  Defendant Biglari continued as the CEO and Chairman of Steak n Shake.

### C.     Defendant Biglari Causes BHI to Violate Federal Law

38.     Defendant Biglari's history of control over BHI also includes violations of federal law.  In particular, in September 2012, the U.S. Department of Justice ("DOJ") imposed an $850,000 penalty against BHI for violating the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR").  The DOJ charged BHI with abusing the HSR's "passive investment" exemption in connection with the Company's acquisitions of shares of Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") in May and June of 2011.  The "passive investor" exemption permits an investor to acquire voting securities to be held solely for the purpose of investment, regardless of the securities' value, so long as the acquirer will not cumulatively hold more than 10% of the seller's issued voting securities as a result of the transaction.

39.     Defendant Biglari's incremental acquisitions of Cracker Barrel stock resulted in BHI's aggregate holdings of Cracker Barrel exceeding the minimum dollar value reporting threshold (then $66 million).  BHI claimed that it qualified for the "passive investor" exemption under the HSR, and thus was not obligated to file notification prior to acquisition of shares.  The DOJ alleged, however, that defendant Biglari's actions following BHI's acquisition of Cracker Barrel stock demonstrated that the Company had no intention of passively holding its Cracker Barrel investment.  These actions included efforts of defendant Biglari to meet with Cracker Barrel representatives within a week after BHI's acquisition to discuss "ideas to improve shareholder value," as well as requests that BHI officers be appointed to the Cracker Barrel board.  In short, defendant Biglari misrepresented the fact that he intended for BHI to actively

participate in the management of Cracker Barrel, therefore causing the Company to be ineligible to take advantage of the HSR's "passive investor" exemption.

## VII.   DEFENDANT BIGLARI'S HISTORY OF SELF-DEALING AT BHI

40.   After consolidating his ownership interests in Western Sizzlin and Steak n Shake with the acquisition discussed above, defendant Biglari pushed through various measures to further solidify his control over the Company.   As detailed below, these measures included defendant Biglari: (i) implementing a reverse stock split to make it more difficult for minority shareholders to acquire enough Company shares to challenge him; (ii) renaming the Company "Biglari Holdings Inc." after himself; (iii) causing the Company to acquire Biglari Capital and invest nearly $36 million into the Lion Fund; and (iv) implementing an excessive compensation plan and golden parachute for himself.

### A.   Defendant Biglari Cements His Control over Steak n Shake by Initiating a Reverse Stock Split

41.   During the first fiscal quarter of 2010, defendant Biglari further solidified his control of Steak n Shake by initiating a twenty for one reverse stock split.   Defendants Cooley and Person, and non-defendant William J. Regan, Jr. ("Regan"), approved the reverse stock split.   The reverse stock split reduced the number of Steak n Shake shares outstanding and significantly increased their per-share price from only $12 per share to approximately $240 per share.   This reverse stock split had the effect of making it more difficult for small shareholders to challenge defendant Biglari because they could no longer afford purchasing enough shares to present a strong position in the Company.   The *Indianapolis Business Journal* criticized Shake n Shake's reverse split in a December 15, 2009 article, stating:

> Biglari has transformed Steak n Shake into a holding company, aka Buffett's Berkshire Hathaway, and has announced plans to use the chain's free cash flow to make acquisitions as he pleases. Steak n Shake agreed in August to acquire the

steak chain Western Sizzlin, another Biglari holding, and has acquired a roughly 10-percent stake in a small insurer.

> ***Now, Biglari hopes to scare off short-term investors by raising the share price of Steak n Shake.*** (Buffett has famously refused to split shares in his Berkshire Hathaway A stock, which now trades for $99,400 a share, although the B shares are available for 1/130th of the cost.)

42.     Defendants Cooley and Person, and non-defendant Regan, approved the reverse stock split in order to further entrench defendant Biglari's position within the Company.

**B.     Steak n Shake Renamed Biglari Holdings Inc.**

43.     In January 2010, Steak n Shake announced that it would change its name to "Biglari Holdings Inc."   Shortly thereafter, on April 8, 2010, Steak n Shake filed Articles of Amended and Restated Articles of Incorporation with the Secretary of State of Indiana changing its name to "Biglari Holdings Inc."

44.     Defendants Biglari, Cooley, and Person, and non-defendants Regan and John W. Ryan ("Ryan"), were on the Board and approved the Company's name change.  The name change further strengthened defendant Biglari's control over the Company.  The name change, however, had no apparent business purpose.  A majority of the Company's business operations were and are restaurant chains which have no connection to defendant Biglari's name or likeness.   In particular, the Company earns over *99%* of its revenue from its Steak n Shake and Western Sizzlin restaurants.  By allowing the name change, the Board once again acquiesced to defendant Biglari's self-interested motives instead of protecting the Company and its minority shareholders.

**C.     Acquisition of Biglari Capital, Investment into the Lion Fund, and Defendant Biglari's Resulting Excessive Compensation Plan**

45.     On April 30, 2010, BHI filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") announcing the acquisition of Biglari Capital, the general partner of defendant Biglari's investment fund, the Lion Fund.  Defendant Biglari had been the Chairman

and CEO of Biglari Capital since its inception in 2000.  Moreover, half of the Board, defendants Biglari, Cooley, and Cooper, were invested in the Lion Fund at the time this acquisition was announced.   As of 2010, the total fair value of defendants Biglari's, Cooley's, and Cooper's investments in the Lion Fund was approximately $2,119,000.  According to the Form 8-K, BHI acquired Biglari Capital pursuant to a Stock Purchase Agreement for approximately $4.175 million.  The Form 8-K stated:

> On April 30, 2010, Biglari Holdings Inc., an Indiana corporation (the "Company"), acquired Biglari Capital Corp., a Texas corporation ("Biglari Capital"), pursuant to a Stock Purchase Agreement, dated April 30, 2010 (the "Stock Purchase Agreement"), between the Company and Sardar Biglari.  Biglari Capital is the general partner of The Lion Fund, L.P., a Delaware limited partnership that operates as a private investment fund (the "Lion Fund").

> Pursuant to the Stock Purchase Agreement, Mr. Biglari sold all of the shares of Biglari Capital to the Company for a purchase price of $1.00 plus (i) an amount equal to Biglari Capital's adjusted capital balance, if any, in its capacity as general partner of the Lion Fund, and (ii) an amount equal to the total incentive reallocation allocable to Biglari Capital for the period from January 1, 2010 through April 30, 2010, less any distributions in respect of such amounts previously received by Mr. Biglari.  The payments set forth in clauses (i) and (ii) above represent solely those amounts that have accrued to date to Biglari Capital, as general partner of the Lion Fund, estimated at closing to be $4.175 million. The Stock Purchase Agreement contains customary representations, warranties and indemnities.

> The Stock Purchase Agreement provides that the Company will prepare and file with the Securities and Exchange Commission proxy materials for a special meeting of its shareholders at which it will submit the Incentive Bonus Agreement (as defined below) for approval by its shareholders for purposes of Section 162(m) under the Internal Revenue Code of 1986, as amended (the "Code"), in order to preserve the tax deductibility to the Company of the performance-based compensation payable to Mr. Biglari under such agreement.  If the Incentive Bonus Agreement is not approved by the Company's shareholders, Mr. Biglari will have the option, exercisable within 30 days after the special meeting, to repurchase Biglari Capital for a purchase price equal to the sum of (i) $1.00, (ii) an amount equal to Biglari Capital's adjusted capital balance, if any, in its capacity as general partner of the Lion Fund, and (iii) an amount equal to the total incentive reallocation allocable to Biglari Capital for the period from April 30, 2010 through the repurchase date, less any distributions in respect of such amounts previously received by the Company.

46.    The buyout was contingent upon shareholder approval of a new *uncapped* compensation package for defendant Biglari consisting of a $900,000 annual salary as well as the opportunity to receive annual incentive compensation payments based on the Company's book value growth each fiscal year.   If BHI exceeded a 5% annual book value growth hurdle, defendant Biglari would receive an incentive bonus payment of 25% of the Company's book value in excess of the hurdle.

47.    Defendant Biglari's proposed compensation plan received heavy criticism from its outset.   For example, on May 17, 2010, the *Indianapolis Business Journal* published an article entitled "Behind The News: Unorthodox Pay Package Puts Biglari on Defensive," which criticized the compensation plan as being "*excessive.*"   Moreover, the article explained that the compensation plan "*would cut deeply into shareholder returns.*"   The article stated:

> Through it all, he's cast himself as a champion of shareholders.  And he's trashed the legions of American companies that pay their management richly even for rotten performance.
>
> But the *new plan is spurring howls of hypocrisy.  On April 30, Biglari Holdings announced it bought the general partner of Sardar Biglari's San Antonio-based hedge fund for the value of its assets.  And in the same regulatory filing, Biglari Holdings said it would begin paying Sardar 25 percent of any increase in the company's annual bookvalue growth topping 5 percent.*
>
> *The Motley Fool columnist, Richard Gibbons, called it "one of the sweetest compensation arrangements I've ever seen at a public company"-one that would cut deeply into shareholder returns.*
>
> In the exotic world of private hedge funds, where wealthy investors pay huge sums in hopes of landing staggering returns, the formula probably wouldn't raise many eyebrows.  But critics say it's overly rich in the public company realm.  And they say it sets the performance bar too low.
>
> *Boosting book value 5 percent is "unexceptional," said Ken Skarbeck, managing partner of Aldebaran Capital and a columnist for IBJ.  "To pay a bonus on top of that is excessive."*  He noted that the pay is in addition to the $900,000 annual salary Biglari receives.

48.     Investors were similarly dissatisfied with the excessive compensation plan and voted against approving it, which caused the stock price of BHI to plummet 26%. Defendant Biglari utilized the stock drop to acquire greater control of the Company by purchasing large amounts of BHI stock through his Lion Fund. When the Lion Fund no longer had sufficient funds, defendants Biglari, Cooley, and Person, and non-defendants Regan and Ryan, caused or allowed BHI to invest approximately *$35.7 million* in the Lion Fund. Approximately $33 million of this investment capital was then used to purchase additional shares in BHI. This investment was material to the Company as it exceeded BHI's profits that year and accounted for nearly 45% of its collective cash and investments. Notably, defendant Biglari, through his control of the Lion Fund, could now control the vote of an addition $33 million, or 8%, worth of BHI stock.

49.     Defendant Biglari was only able to have his compensation plan approved by a "majority" of BHI's shareholders after he caused the Lion Fund to purchase over $33 million worth of BHI stock with the Company's money. Even then, defendant Biglari had to modify the compensation plan with a maximum cap. Under the revised compensation plan, defendant Biglari would receive a salary of $900,000 and up to an additional $10 million in incentive compensation each year the Company's book value increased by at least 6%. Additionally, the new package provided that defendant Biglari would be entitled to receive a severance payment equal to *299%* of the average annual cash compensation paid to him if there is a change in control at the Company and he loses his position, if he is terminated by the Company without cause, or if he resigns for good reason. This new compensation plan coupled with the golden parachute further entrenched defendant Biglari's position at BHI and ensured that he would not lose control over the Company.

50.     There was no legitimate business purpose for BHI to invest so much money into the Lion Fund, only for the Lion Fund to use this same amount of money to purchase BHI stock. If the Board believed that BHI's stock was undervalued, it could have simply initiated a repurchase. Instead, the Board structured the transaction with the Lion Fund as an intermediary so that defendant Biglari could increase his control over BHI. The BHI shares that the Lion Fund purchased using the Company's money retained their voting rights despite the fact that public companies generally retire the shares they repurchase. Defendant Biglari was the main beneficiary of the power associated with these additional voting rights as he is deemed to have the sole power to vote and dispose of the Lion Fund's shares. Thus, defendants Biglari, Cooley, and Person funneled money out of the Company and into the Lion Fund in order for defendant Biglari and his loyal directors to increase their control over the Company.

## VIII.   DEFENDANT BIGLARI'S CHALLENGED SELF-DEALING

### A.     Defendant Biglari's Self-Serving License Agreement

51.     Defendant Biglari and his loyalist Board continue to take actions that entrench defendant Biglari's position at the Company. On January 11, 2013, the Company filed a Form 8-K with the SEC announcing defendant Biglari's new License Agreement with the Company. Under the License Agreement, BHI can use defendant Biglari's name for twenty years and does not have to pay royalties unless defendant Biglari's employment is terminated without cause, there is a change in control at the Company, or an "[i]nvoluntary [t]ermination [e]vent" arises. If one of these triggering events occurs, however, defendant Biglari will receive *2.5%* of BHI's revenue for at least *five years*. The Form 8-K stated:

> On January 11, 2013, Biglari Holdings Inc. (the "Company" or "Licensee")
> entered into a Trademark License Agreement (the "Agreement") with Sardar
> Biglari, Chairman and Chief Executive Officer of the Company ("Licensor"). The
> Agreement was unanimously approved by the Governance, Compensation and
> Nominating Committee of the Board of Directors of the Company.

Under the Agreement, Licensor granted to Licensee an exclusive license to use the name and mark Biglari (alone or in connection with other terms and/or designs) (the "Licensed Marks") in association with the provision of investment services, franchising services, financial services, restaurant franchising (including business management assistance in the establishment and/or operating of restaurants), hospitality services, hotel management services, insurance services, restaurant services, retail and retail related services, real estate services and apparel (collectively, the "Products" and the "Services") throughout the world. Upon (a) the expiration of twenty years from the date of the Agreement (subject to extension as provided in the Agreement), (b) the death of Licensor, (c) the termination of Licensor's employment by Licensee for Cause (as defined in the Agreement), or (d) Licensor's resignation from his employment with Licensee absent an Involuntary Termination Event (as defined in the License Agreement), the Licensed Marks for the Products and Services will transfer from Licensor to Licensee without any compensation if Licensee is continuing to use the Licensed Marks in the ordinary course of its business; otherwise, the rights will revert to Licensor.

The license provided under the Agreement is royalty-free unless and until one of the following events occurs: (i) a Change of Control (as defined in the Agreement) of Licensee; (ii) the termination of Licensor's employment by Licensee without Cause; or (iii) Licensor's resignation from his employment with Licensee due to an Involuntary Termination Event (each, a "Triggering Event"). Upon the occurrence of a Triggering Event and for a specified period of no less than five years thereafter, Licensor will be entitled to receive a royalty from Licensee equal to two and one-half percent of revenues received by Licensee, its subsidiaries and affiliates from Products, Services and businesses associated with a Licensed Mark prior to or following the Triggering Event, as specifically provided in the Agreement.

52.     Based upon the Company's 2012 reported revenue, defendant Biglari would be entitled to as much as *$18.35 million* under the License Agreement if one of the triggering events occurs.  The magnitude of such a payment would be detrimental to the Company given that its operating income in 2012 was just over $38 million and its net income available to common shareholders was only $21 million.  Such a large payout under the License Agreement would threaten the Company's liquidity and would wipe out nearly all of the net income available to BHI's shareholders.

53.     Moreover, the License Agreement does not confer any material benefit to the Company because as discussed above, there was no apparent business purpose in renaming the

Company after defendant Biglari.  The majority of the Company's business is concentrated on two restaurant chains, Western Sizzlin and Steak n Shake.  These two restaurant chains have much more name recognition in their industry than "Biglari."  The Board cannot possibly demonstrate that License Agreement was entirely fair to the Company, both in terms of process and substance.

54.     Despite the potential negative effect the License Agreement can have on the Company and its outside shareholders, and the lack of any material benefit provided to BHI, defendants Cooper, Johnson, Mastrian, and Person unanimously approved the License Agreement.  In addition to the apparent threat the License Agreement has on the Company's liquidity, the License Agreement deters outsiders that may be interested in acquiring BHI, as the 2.5% change in control premium is costly and may not justify an acquisition.  Defendants Cooper, Johnson, Mastrian, and Person breached their fiduciary duty by failing to take action to assure the fairness of the License Agreement, despite the risk of harm posed by the License Agreement and the fact that defendant Biglari stands on both sides of this transaction.

**B.     Defendant Biglari Continues to Increase His Power over BHI with a New Rights Offering**

55.     Defendant Biglari is now also pursuing a shareholder rights offering to increase his voting power at BHI.  Under the shareholder rights offering, each holder of BHI common stock would be entitled to receive one right per share that they own, enabling them to subscribe for one common share.  Similar to what was done at Western Sizzlin, the shareholder rights offering serves as an opportunity for defendant Biglari to further entrench himself by acquiring additional shares of the Company at a discount to their current trading value.  On February 5, 2013, the Company filed a Form 8-K with the SEC discussing the new rights offering, which stated:

On February 5, 2013, Biglari Holdings Inc. (the "Company") filed a registration statement on Form S-3 with the Securities and Exchange Commission (the "SEC") for a rights offering to its existing shareholders. The rights offering will be made through the distribution of transferable subscription rights as a means of purchasing shares of the Company's common stock at a subscription price to be decided. Assuming the rights offering is fully subscribed, the Company expects to receive gross proceeds of approximately $50 million, minus the expenses of the rights offering. The net proceeds will be used for general corporate purposes as well as for making acquisitions or investments. The Company has not identified any acquisitions or investments for which it intends to use the offering proceeds. It is important to note that the Company is in the business of owning other businesses in whole and in part without regard to any particular industry.

56.     This new rights offering is the latest example of the Board blindly acquiescing to defendant Biglari's desire to increase his power and entrench himself within the Company.

## IX.     DAMAGES TO BHI

57.     As a result of the Individual Defendants' improprieties, BHI was forced to enter into the self-serving License Agreement with defendant Biglari on terms highly beneficial to defendant Biglari and highly detrimental to BHI. Moreover, the Company may soon initiate a shareholder rights offering for defendant Biglari's personal benefit. Defendant Biglari's history of using BHI to accomplish his own goals rather than maximizing value for the Company and its shareholders has damaged BHI's corporate image and goodwill.

## X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of BHI to redress injuries suffered, and to be suffered, by BHI as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. BHI is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

59.     Plaintiff will adequately and fairly represent the interests of BHI in enforcing and prosecuting its rights.

60.     Plaintiff was a shareholder of BHI at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current BHI shareholder.

61.     The current Board of BHI consists of the following six directors: defendants Biglari, Cooley, Mastrian, Johnson, Cooper, and Person.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.     Demand Is Excused Because Defendants Have the Burden of Proving the Entire Fairness of the License Agreement at Issue in This Action

62.     The directors' fiduciary duty requires the exercise of utmost good faith, fair dealing, disclosure, and avoiding even the impropriety of self-interest or self-dealing.   As discussed in more detail herein, defendant Biglari stands on both sides of the License Agreement transaction and proposed shareholder rights offering at issue in this action.  Defendant Biglari received certain benefits not shared by the Company's outside shareholders when BHI entered into the License Agreement.  Moreover, defendant Biglari is pursing the shareholder rights offering to increase his voting power at BHI and further entrench himself in the Company. When a fiduciary stands on both sides of a transaction, as is the case here, the transaction must be entirely fair to the Company's shareholders.  As explained below, at least half the Board is not independent of defendant Biglari.   Accordingly, the License Agreement between defendant Biglari and BHI and the proposed rights offering are subject to the rigorous judicial scrutiny of the entire fairness standard.  Because entire fairness is the standard of review, the challenged self-dealing is not protected by the business judgment rule.  Thus, this Court must not presume that the Board acted on an informed basis, in good faith, and in the honest belief that the

challenged transactions were in the best interests of the Company.   The burden of proving the inherent or entire fairness of the License Agreement and the proposed shareholder rights offering, including all aspects of these transactions' negotiation, structure, and terms, is placed upon the Board, as a matter of law.   Accordingly, demand is excused.

**B.      Demand Is Excused Because a Majority of the Board Lacks Independence From, and Is Beholden to, Defendant Biglari**

63.      A majority of the Board is not independent from Biglari, the primary beneficiary of the License Agreement at issue in this action.   As an initial matter, defendant Biglari has concentrated the control over the Company in his hands.   As BHI discloses in its financial filings, "all major operating, investment, and capital allocation decisions are made for the Company and its subsidiaries by [Biglari], Chairman and [CEO]."   In addition, defendant Biglari is the Company's largest shareholder, owning over 15% of BHI's stock.

64.      Further, the Board's history shows that it will defer to defendant Biglari and act for his benefit rather than BHI's public shareholders.   As detailed above, defendants Cooley and Person approved numerous measures in the past which had no apparent business purpose and conferred no material benefit to the Company, just to please defendant Biglari.   These measures included: (i) implementing a reverse stock split to make it more difficult for small shareholders to acquire enough Company shares to challenge defendant Biglari; (ii) renaming the Company "Biglari Holdings Inc."; (iii) causing the Company to acquire Biglari Capital and investing nearly $36 million into the Lion Fund; and (iv) implementing an excessive compensation plan and golden parachute for defendant Biglari.

65.      Defendant Cooley is not independent of defendant Biglari because he owes his livelihood to companies controlled by defendant Biglari and because the two have maintained a relationship since defendant Cooley was defendant Biglari's professor at Trinity University.   In

2000, defendant Biglari brought defendant Cooley onto the board of Biglari Capital as an advisory director. Five years later, defendant Biglari brought defendant Cooley onto the board of Western Sizzlin and appointed defendant Cooley Vice Chairman. Defendant Biglari has also pushed for board seats for defendant Cooley in other entities in which he had a large ownership interest, including the Lion Fund, Cracker Barrel, and Friendly Ice Cream Corp. Defendant Cooley has recently retired from teaching and now relies on defendant Biglari-controlled entities for his livelihood. In fact, BHI increased defendant Cooley's pay to $210,000 four months after he retired from teaching in May 2012. In addition to his salary at BHI, defendant Cooley earns a yearly salary of $47,500 serving as a director at CCA Industries, Inc. ("CCA"), in which Biglari Holdings owns an 11% stake. The average salary for a professor teaching at Trinity University is approximately $114,000, less than half of the combined $257,500 defendant Cooley is paid for his work at defendant Biglari-controlled entities. As further evidence of his control, defendant Biglari controls the ability to vote and dispose of the BHI stock held by defendant Cooley. As such, defendant Cooley lacks the adequate independence necessary to prosecute a suit against defendant Biglari, rendering any demand upon defendant Cooley futile.

66.     Confirming these concerns regarding defendants Biglari and Cooley's ability to vigorously prosecute the claims alleged herein, BHI has disclosed in its SEC filings that defendants Biglari and Cooley are not considered independent directors under the listing standards of the New York Stock Exchange and rules promulgated by the SEC.

67.     Defendants Mastrian, Cooper, and Person also suffer from conflicts of interest and are beholden to or dominated by defendant Biglari because they serve or previously served on the boards of other defendant Biglari-controlled companies, in addition to BHI. For example:

(a)     defendant Mastrian is a director at CCA, in which Biglari Holdings owns a large stake, and on whose board defendants Biglari and Cooley sit;

(b)     defendant Cooper served on the board of Western Sizzlin alongside defendants Biglari and Cooley from early 2007 until it was acquired by BHI in 2010;[1] and

(c)     defendant Person served on the board of BHI's predecessor, Steak n Shake, along with defendants Biglari and Cooley.

68.     In addition to their role in defendant-Biglari controlled entities, defendants Biglari and Cooley, and non-defendant Regan, have all been involved with Consumer Credit Counseling Service of Greater San Antonio ("CCCSSA") since at least 2008.  In particular, both defendants Biglari and Cooley are CCCSSA directors and have been since at least May 2006, and non-defendant Regan is Treasurer of CCCSSA and has been since 2008.

69.     For all the foregoing reasons, defendants Cooley, Mastrian, Cooper, and Person lack independence from defendant Biglari.  Demand is therefore excused as to defendants Cooley, Mastrian, Johnson, Cooper, and Person.

### C.     Demand Is Excused Because Defendants Cooper, Johnson, Mastrian, and Person Face a Substantial Likelihood of Liability for Their Misconduct

70.     As members of the Governance, Compensation and Nominating Committee during the time of the wrongdoing, defendants Cooper, Person, Mastrian, and Johnson owed specific duties to BHI to assist the Board in overseeing the Company's corporate governance guidelines and compensation policies.  As alleged above, defendants Cooper, Johnson, Mastrian, and Person face a substantial likelihood of liability for approving the License Agreement in their

---

[1] Further demonstrating defendant Cooper's lack of independence from defendant Biglari, defendant Biglari is a board member of Ascot Management, LLC, which defendant Cooper founded in 2006.

capacity as members of the Governance, Compensation and Nominating Committee. Defendants Cooper, Johnson, Mastrian, and Person had direct knowledge that the License Agreement sacrificed BHI's interests for the interests of defendant Biglari. Despite that knowledge, defendants Cooper, Johnson, Mastrian, and Person agreed to enter into the License Agreement and simply acquiesced to defendant Biglari's self-dealing. By placing the interests of defendant Biglari ahead of BHI, defendants Cooper, Johnson, Mastrian, and Person breached their duty of loyalty. The Governance, Compensation and Nominating Committee Defendants also breached their fiduciary duties of loyalty and good faith because they failed to implement the adequate corporate governance controls to avoid the self-dealing alleged herein. Accordingly, defendants Cooper, Person, Mastrian, and Johnson face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

71.     As members of the Audit Committee during the time of the wrongdoing, defendants Cooper, Person, Mastrian, and Johnson had additional and heightened responsibility to oversee the Company's operations. Moreover, the Audit Committee Defendants were responsible for implementing and maintaining an adequate system of internal controls to ensure the Company's compliance with applicable rules and regulations. The Audit Committee Defendants breached their fiduciary duties of loyalty and good faith because they knowingly and recklessly failed to ensure such internal controls were in place as demonstrated by the approval of the self-serving License Agreement which occurred under their watch. Thus, defendants Cooper, Person, Mastrian, and Johnson face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

72.     Additionally, the entire Board breached its duty of loyalty by allowing the Company to enter into the self-serving License Agreement with defendant Biglari and permitting

defendant Biglari to pursue the proposed shareholder rights offering.  As explained above, the License Agreement put BHI's financial future in jeopardy without conferring any material benefit to the Company.  Similarly, defendant Biglari is pursing the shareholder rights offering to benefit himself, not the Company.  In particular, defendant Biglari intends to use the shareholder rights offering to increase his voting power at BHI and further entrench himself within the Company. Defendants Biglari, Cooley, Mastrian, Johnson, Cooper, and Person failed to implement adequate internal controls and procedures to avoid the self-dealing discussed herein.  As a result of defendants Biglari, Cooley, Mastrian, Johnson, Cooper, and Person's course of conduct, the Company is now subject to the unfair License Agreement.  Moreover, the Company may soon initiate a shareholder rights offering for defendant Biglari's personal benefit.  Accordingly, defendants Biglari, Cooley, Mastrian, Johnson, Cooper, and Person face a substantial likelihood of liability for their misconduct, rendering any demand upon them futile.

73.     BHI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.  Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for BHI any part of the damages BHI suffered and will suffer thereby.  The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the self-dealing alleged herein in the face of media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

74.     Plaintiff has not made any demand on the other shareholders of BHI to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)      BHI is a publicly held company with over 1.4 million shares outstanding and hundreds of shareholders;

(b)      making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## XI.   COUNT I - AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

75.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76.     The Individual Defendants, as directors of BHI, are fiduciaries of the Company and its shareholders.  As such, they owe the Company the highest duties of loyalty, candor, and good faith and fair dealing.

77.     Defendant Biglari breached his fiduciary duties by using his control over BHI and the Individual Defendants to cause the Company to enter into the self-serving License Agreement, despite knowing that this License Agreement would ultimately be detrimental to the Company.

78.     The Director Defendants, defendants Biglari, Cooley, Person, Cooper, Johnson, and Mastrian, breached their fiduciary duties by failing to fairly and properly evaluate the License Agreement, by approving and permitting the License Agreement to go forward on terms unfavorable to the Company and its outside shareholders, by failing to put in place sufficient internal controls to stop the License Agreement from going forward on terms unfavorable to the

Company and its outside shareholders, and by elevating the interests of defendant Biglari over the interests of BHI.

79.     The Audit Committee Defendants, defendants Cooper, Person, Mastrian, and Johnson, breached their fiduciary duties by failing to fairly to ensure that the Company had an adequate system of internal controls to monitor self-dealing.

80.     The Governance, Compensation and Nominating Committee Defendants, defendants Cooper, Person, Mastrian, and Johnson, breached their fiduciary duties by failing to fairly to properly oversee the Company's corporate governance guidelines and compensation policies.

81.     In contemplating, planning, and/or effecting the foregoing conduct, the Individual Defendants were not acting in good faith toward the Company and breached their fiduciary duties.

82.     As a result of these actions of the Individual Defendants, the Company has been and will be damaged.

## XII.   COUNT II - AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     As a result of the wrongdoing discussed above, the Individual Defendants have caused BHI to waste its assets by entering into the self-serving License Agreement with defendant Biglari and paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

85.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

86.     Plaintiff, on behalf of BHI, has no adequate remedy at law.

## XIII.  COUNT III - AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

87.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BHI.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to BHI.

89.     Defendant Biglari received the largest windfall as result of the Company entering the self-serving License Agreement.

90.     Plaintiff, as a shareholder and representative of BHI, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

91.     Plaintiff, on behalf of BHI, has no adequate remedy at law.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of BHI, demands judgment as follows:

A.   Rescission of the self-serving License Agreement discussed herein;

B.   Restricting defendant Biglari from purchasing additional BHI shares via the Company's shareholder rights offering;

C.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

D.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BHI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over self-dealing through the creation of an independent committee tasked with the responsibility of supervising and approving related-party transactions;

2.      a provision to permit the shareholders of BHI to nominate at least three independent candidates for election to the Board;

3.      a provision to ensure that at least half the Board is independent of defendant Biglari;

4.      a proposal to appoint a new Chairman of the Board who is independent of defendant Biglari; and

5.      a proposal to implement procedures for greater shareholder input into the policies and guidelines of the Board;

E.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' wrongdoing so as to assure that plaintiff on behalf of BHI has an effective remedy;

F.   Awarding to BHI restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court deems just and proper.

## XV. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 2, 2013

PONCIO LAW OFFICES,
A Professional Corporation

ADAM PONCIO (Bar No. 16109800)

5410 Fredericksburg Rd., Suite 109
San Antonio, Texas 78229-3550
Telephone: (210) 212-7979
Facsimile: (210) 212-5880
aponcio@ponciolaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
LAUREN N. OCHENDUSZKO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
lochenduszko@robbinsarroyo.com

Attorneys for Plaintiff

877677

- 33 -

<u>VERIFICATION</u>

I, Edward Donahue, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____June 28, 2013_____

_____
EDWARD DONAHUE